UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:17-cr-37-HSM-SKL |
| | ) | |
| JESUS ANDRES LUJAN, JR., | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT & RECOMMENDATION

Before the Court is a motion to suppress filed by Jesus Andres Lujan, Jr. ("Defendant") seeking to suppress all evidence resulting from a vehicle stop [Doc. 27].[1] Defendant alleges the stop violated the Fourth Amendment to the United States Constitution. Plaintiff United States of America ("the government") filed a response in opposition to the motion [Doc. 33]. An evidentiary hearing on the motion was held May 1, 2018. Thereafter, the parties submitted post-hearing briefs in support of their respective position [Docs. 39 & 40]. After fully considering all of the parties' evidence and argument, I **RECOMMEND** that Defendant's motion to suppress be **GRANTED**.

## I.    FACTUAL BACKGROUND

During the evidentiary hearing, the government presented the testimony of the sole witness, Tennessee Highway Patrol ("THP") State Trooper Donnie Clark ("Clark"). Clark has 24 years of law enforcement experience with THP. Much of the encounter between Defendant and Clark was recorded by Clark's patrol car video equipment and the recording was made Exhibit 1 to the

---

[1] The motion to suppress was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b) [Doc. 28].

hearing.

On October 25, 2017, Clark was in the left lane traveling eastbound on Interstate 24 near Exit 111 in Winchester, Tennessee when he noticed a van in the right lane with a paper temporary license tag affixed to the rear of the large passenger van. As he traveled in the same direction passing the van in the next lane, Clark made eye contact with the driver of the van. Upon making eye contact, the driver of the van—later identified as Defendant—first slowed down and then abruptly took Exit 111-A. The eye contact and driving maneuver drew Clark's attention because the exit appeared to be unplanned and "kicked up" gravel from the shoulder of the road. Clark immediately took Exit 111-B (the second ramp of the exit) so he could follow the van on Highway 55.

As he entered Highway 55, Clark manually turned on his recording equipment and narrated why he was following the van. Clark's narration focused on the temporary license tag, which Clark concluded was not "very visible." Clark was looking for the state of origin and the temporary tag number so he could "run" the tag to get the vehicle information. As Clark followed the van, it stopped at a red light and Clark stopped directly behind the van about a car length to a car length and a half behind the van. Clark could still not read the state of origin, but he could read the main tag number. Clark had already decided to stop the van for two reasons: (1) the van made a "somewhat" suspicious and reckless exit that appeared unexpected, and (2) he could not "make out" the tag. However, Clark decided to wait until he was at a safer place to initiate the stop, so he did not activate his blue lights at the red light.

The vehicles traveled a short distance from the red light and Clark activated his blue lights and siren. The van promptly turned into a church parking lot. Clark exited his patrol car, which was behind the van preventing it from leaving, and Clark walked to the van.

2

On cross-examination, Clark testified the tag was not clearly legible because it was faded and covered in plastic that looked like a Ziploc-type of bag. The plastic and fading made the tag difficult to read. Clark never wavered from his testimony that he could not read the state of origin information on the tag even when stopped at the red light. Clark's testimony was not clear as to whether he could read the tag and identify the state of origin/issuance from his patrol car behind the van in the church parking lot or only once he was on foot approaching the van. What was clear is that Clark could read the temporary tag and he determine it had the required information on it prior to speaking with the driver.

Clark said once he determined the physical condition of the tag was in compliance in the church parking lot, he still had reason to continue the traffic stop because he wanted to check to see if the tag went with the van and wanted to check the driver's license. It is not clear when those checks were eventually made, but Clark did not check the registration and driver's license information until after Defendant was detained in the back of the patrol car. Clark did not know if there was a Tennessee law that applied to the display of a temporary tag, but he was aware of Tennessee's tag display statute, Tenn. Code Ann. § 55-4-110(b). Clark agreed the tag was properly fastened to the van in a place and spot clearly visible, but indicated he thought the plastic was a foreign material.[2] On cross-examination, Clark agreed that he eventually determined the tag was legal under § 55-4-110(b), regardless of any faded condition or plastic covering.

Clark proceeded to the driver's door of the van, which had darkly tinted windows. Defendant was on his cell phone when Clark approached. Clark asked for Defendant's driver's license after greeting him and asked Defendant to exit the van. When Defendant did so, Clark

---

[2] The government did not argue the plastic covering itself was a "foreign material" constituting a violation of § 55-4-110(b).

3

peeked inside the van and, for the first time, Clark saw "multiple" people in the van. Clark asked how many people were in the van and Defendant said, "fifteen or sixteen."

Clark then had Defendant move to the back of the van and explained to Defendant that he could not read the state of origin as he drove down the interstate. Clark then asked Defendant a series of questions over a couple of minutes. He asked where Defendant was headed and Defendant replied he was traveling to Atlanta. Clark asked where Defendant was coming from and he responded he was coming from Houston. Clark asked for Defendant's identification. Clark asked why Defendant took the exit (Exit 111) if he was headed to Atlanta, and Defendant responded, "Just nervous." Clark asked why nervous, and Defendant said, "Just going to work." In his testimony, Clark asked Defendant where *they* (the occupants) worked and Defendant said *they* were construction workers. On the video, Clark asked Defendant where *he* worked and Defendant said *he* was a construction worker. Clark then asked if the people in the van were legal and Defendant said, "Yes." Clark asked the same question again, and Defendant again said, "Yes." Clark said, "Why are you nervous, then?" Defendant then admitted he knew the occupants were "illegal."

Clark testified that when he initially peered into the van as Defendant exited it, he found the number of van occupants unusual. On cross-examination, Clark agreed that the mere presence of multiple van occupants does not violate the law. During lengthy questioning at the hearing as to whether Clark suspected the occupants of the van were illegally in the country due to their "Hispanic appearance," Clark repeatedly stated the occupants' physical appearances (described in questioning as small stature and dark hair/skin) was not suspicious. Clark repeatedly said he became suspicious once Defendant indicated they worked in construction because a few of the van occupants appeared to be young and the occupants were not dressed in construction gear/attire.

4

The pertinent interaction between Clark and Defendant is recorded.   The parties agree that the relevant timeframe for consideration of the issues presented in the motion to suppress is on the recording of the stop at the time stamp from 14:02 to 14:08.[3]   The patrol car lights were activated at 14:05:00 and Defendant was locked in the patrol car back seat by 14:08:40.   When Clark first had Defendant come to the back of the van, Clark stated, "[I] couldn't read the, uh, tag properly there. Uh, the uh, drivin' down the interstate, I couldn't tell that was from Texas." [Exhibit 1 at 14:06:13-21].   About twenty seconds later, at 14:06:42, Clark and Defendant discussed the passengers approximately as follows:

Clark: Okay. Why are you nervous?

Defendant: Just going to work.

Clark: Where you—where you work at?

Defendant: Carpenter.

Clark: Huh?

Defendant: Carpenter. Apartments, building apartments, framing.

Clark: Okay. These people in here, are they legal?

Defendant: Yes, sir.

Clark: You sure?

---

[3] During the hearing, the government agreed that Clark asked two questions in a custodial interrogation of Defendant (at 14:15:00 to 14:15:30) without first advising him of his *Miranda* rights.   The government further agreed it would not seek to introduce those questions, or the answers to the questions, in its case-in-chief.   Defendant stated that this agreement resolved any issues he raised in his motion regarding a *Miranda* violation and indicated he was not raising any other *Miranda* issues for court consideration.   Likewise, Defendant does not contest that there was probable cause to arrest him at the time he was placed into the backseat of the locked patrol car.   Rather, he contends that the scope and duration of the stop, which resulted in the development of probable cause when Defendant admitted he had illegal aliens in the van, was unconstitutional.

5

Defendant: Yes, sir.

Clark: Why are you nervous, then?

Defendant: 'Cause I know they're illegal.

[*Id.* at 14:06:42-14:07:03].

Eventually, sometime after Defendant was detained in the patrol car, Clark ran the tag and driver's license and determined the temporary tag was lawful and properly registered and that Defendant had a valid driver's license and insurance paperwork. Clark has a computer in his patrol car that allows him to run some information, he can also ask dispatch to run information and, if necessary, dispatch can contact authorities in other states to run information.

## II.   ANALYSIS

Defendant is charged in a four-count Indictment with transportation of aliens with knowledge of their unlawful presence in the country on October 25, 2017, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) [Doc. 8]. Defendant seeks to suppress all evidence resulting from the traffic stop and his ensuing arrest on that day. The reasonableness of such a traffic stop involves a two-part inquiry: first, whether the initial seizure was justified and, second, whether subsequent police conduct "was reasonably related in scope to the circumstances that justified" the initial interference. *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968).

### A.  Standards

The cornerstone of Defendant's argument is the Fourth Amendment, which prohibits

*unreasonable* seizures.   U.S. Const. amend. IV.[4]   In other words, seizures are not prohibited by

the Constitution; rather, the Constitution requires a seizure be reasonable under the circumstances.

*See Elkins v. United States*, 364 U.S. 206, 222 (1960) ("[W]hat the Constitution forbids is not all

searches and seizures, but unreasonable searches and seizures.").   The underpinning for analysis

of the constitutionality of a traffic stop is provided in *Terry* and its progeny.   *Whren v. United*

*States*, 517 U.S. 806, 809-10 (1996) (holding *Terry* traffic stops constitute a "seizure" within the

meaning of the Fourth Amendment).

         To be constitutional, a traffic stop for a tag display violation must be supported by a

"reasonable suspicion."   *United States v. Simpson*, 520 F.3d 531, 540 (2008).[5]   The "reasonable

suspicion" standard is an "elusive concept" that must flexibly apply to the infinite factual scenarios

law enforcement officers face.   *United States v. Cortez*, 449 U.S. 411, 417-19 (1981); *see also*

*United States v. Arvizu*, 534 U.S. 266, 274-75 (2002) ("Our cases have recognized that the concept

of reasonable suspicion is somewhat abstract.   . . .   But we have deliberately avoided reducing

---

[4] A defendant has the burden of establishing a legitimate expectation of privacy to assert a Fourth
Amendment right.   *United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001).   As a preliminary
matter, the government does not contest that Defendant had a legitimate expectation of privacy
with respect to the stop.   Thus, if either the basis for the initial traffic stop or the scope and
duration of the stop is unlawful, then the evidence obtained may be excluded.   In this case,
Defendant challenges both the basis for, and the scope or duration of, the stop.

[5] The Sixth Circuit "has developed two separate tests to determine the constitutional validity of
vehicle stops: an officer must have probable cause to make a stop for a civil infraction, and
reasonable suspicion of an ongoing crime to make a stop for a criminal violation."   *United States*
*v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008); *see also Simpson*, 520 F.3d at 541 (holding that
reasonable suspicion standard is sufficient for ongoing traffic violation, but not a completed
misdemeanor). In *Simpson*, the Sixth Circuit directly addressed the standard applicable for a stop
based on a violation of § 55-4-110(b) and held that because an alleged "failure to keep a license
plate 'clearly legible' is an ongoing violation of § 55-4-110(b), the standard of reasonable
suspicion applies."   520 F.3d at 533, 541.   Moreover, Defendant concedes the Court must apply
the reasonable suspicion standard to determine the legality of this traffic stop for a violation of §
55-4-110(b), not the higher probable cause standard [Doc. 39 at Page ID # 197].

it to a neat set of legal rules.") (citations omitted) (internal quotation marks omitted).   Although

designed as an adaptable standard, reasonable suspicion must be based on something more than

"inarticulate hunches."   *Terry*, 392 U.S. at 22.   Police officers must have a "particularized and

objective basis for suspecting the particular person stopped of criminal activity."   *Cortez*, 449

U.S. at 417-18.   This "demand for specificity in the information upon which police action is

predicated is the central teaching of . . . Fourth Amendment jurisprudence."   *Terry*, 392 U.S. at

21 n.18.

Addressing this standard of reasonable suspicion standard for a traffic stop, the Supreme

Court recently held:

> The Fourth Amendment permits brief investigative stops—such as
> the traffic stop in this case—when a law enforcement officer has a
> particularized and objective basis for suspecting the particular
> person stopped of criminal activity.   The reasonable suspicion
> necessary to justify such a stop is dependent upon both the content
> of information possessed by police and its degree of reliability.
> The standard takes into account the totality of the circumstances—
> the whole picture. Although a mere hunch does not create
> reasonable suspicion, the level of suspicion the standard requires is
> considerably less than proof of wrongdoing by a preponderance of
> the evidence, and obviously less than is necessary for probable
> cause.

*Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) (citations and quotation marks omitted); *see*

*also United States v. Hughes*, 606 F.3d 311, 316 (6th Cir. 2010) (holding that "for [a] traffic stop

to be permissible under the Fourth Amendment, a police officer must know or reasonably believe

that the driver of the car is doing something that represents a violation of law" and "that police

officers may not look for after-the-fact justifications for stops that would otherwise be

impermissible . . . .").

Defendant, as the proponent of the motion to suppress, generally bears the burden of

establishing his Fourth Amendment rights were violated, *Rakas v. Illinois*, 439 U.S. 128, 130 n.1

(1978), but it is the government's burden to demonstrate by a preponderance of the evidence that the stop was proper, *see United States v. Bradley*, 163 F. App'x 353, 357 (6th Cir. 2005) (citing *United States v. Matlock*, 415 U.S. 164, 177 n. 14 (1974). Evidence seized during an unlawful traffic stop should be suppressed. *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008).

### B. Reasonable Suspicion for the Stop

The first inquiry concerning the reasonableness of the stop in this case centers on Tennessee's tag display statute, Tenn. Code Ann. § 55-4-110(b). Defendant argues Clark did not possess the requisite reasonable suspicion to make the initial traffic stop because the van's temporary tag was current, unobstructed, and properly displayed on the rear of the van. The government responds that Clark had reasonable suspicion to stop the van for a violation of Tennessee's tag display statute.

As noted above, when determining whether a police stop is "predicated" upon sufficient particularity, courts are directed to look at the "whole picture" and to take into account the "totality of the circumstances." *Cortez*, 449 U.S. at 418. This Court must consider two elements to determine whether the stop was permissible under the Constitution. *See id.* First, the Court must assess all relevant information available to the stopping officer, Clark. *Id.* This includes, but is not limited to, general objective observations, "information from police reports, if such are available, and considerations of the modes or patterns of operation of certain kinds of lawbreakers." *Id.* It is from this information "a trained officer draws [the sort of] inferences and makes deductions . . . that might well elude an untrained person." *Id.* Second, the Court considers, based on the available information, whether Clark had particular suspicion Defendant was "engaged in wrongdoing." *Id.* The pertinent issue is whether Clark's traffic stop was supported by reasonable suspicion, not whether the tag's display actually violated § 55-4-110(b).

*See Simpson*, 520 F.3d at 542 ("[t]he proper question is not whether [defendant] was, in fact, violating [the tag statute] . . .. The question is whether [the police officer] had an objectively reasonable suspicion that a violation of that statute was occurring.").[6]

Tennessee law regarding the legibility of a tag, in relevant part, states:

> Every registration plate shall at all times be securely fastened in a horizontal position to the vehicle for which it is issued . . . in a place and position to be clearly visible and shall be maintained free from foreign materials and in a condition to be clearly legible; . . .

Tenn. Code Ann. § 55-4-110(b). Defendant has not directly disputed that the above statute applies to the temporary tag at issue in this case. *See also Simpson*, 520 F.3d at 535-37 (predicting how Tennessee's highest court would rule, and holding that § 55-4-110 applies to out-of-state vehicles and temporary tags); *see also* Tenn. Code Ann. § 55-4-101(e) ("The department, in its discretion, may grant a temporary permit to operate a vehicle for which application for registration has been made, where the application is accompanied by the proper fee pending action upon the application by the department.").

Clark testified that he stopped the van for two reasons: its "suspicious and reckless" exit from the interstate and because he could not read the state of origin on the temporary tag. As argued by Defendant, Clark never stated that the state of origin was not on the tag or that it was illegible when viewed within a few feet of the tag after he stopped the van. Nor did Clark testify

---

[6] When addressing the state law issue, the Court is instructed to step carefully and not unnecessarily create new, broad interpretations or disturb contours already set forth by Tennessee judges. *Simpson,* 520 F.3d at 544. State courts are the definitive interpreters of their state's laws and federal courts honor those decisions as a principle of federalism. As to the constitutional issue, however, Tennessee law does not control this Court's interpretation of the United State Constitution. State and lower federal courts share independent and concurrent jurisdiction to interpret the Constitution; in this context neither system controls the other but both are bound by the United States Supreme Court. *See Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 286 (1970) ("Each system proceeds independently of the other with ultimate review in this Court of the federal questions raised in either system.").

10

that the abrupt exit was a violation of any traffic law. Furthermore, while Clark briefly mentioned the plastic as a possible "foreign material" in his testimony, he never indicated it was a violation of Tennessee law to cover a temporary tag in plastic, presumably to protect it from disintegrating in wet weather.

There are only a few cases that specifically address the tag statute's standards. *See Simpson*, 520 F.3d at 535 n.4 (explaining the scarcity of opinions regarding § 55-4-110 application to out-of-state tags is "likely due to the fact that traffic offenses in Tennessee are tried in Municipal and General Session courts, which are not courts of record."). Noting it was not aware of any Tennessee case law establishing a precise distance from which a temporary tag's expiration date must be visible and clearly legible, the Sixth Circuit in *Simpson* held it was "reasonable to assume that more than a few feet is required." *Id.* at 542. Defendant did not argue that the lack of an ability to read the state of origin from a car length to a car length and a half back was improper, but he does seem to raise concerns about whether it was reasonable for Clark to stop the van on that basis. Clark, however, credibly testified that he could not see the state of origin on the temporary tag and that he could not obtain information from the THP dispatcher or other sources about the van without the state of origin information.

Stopping a vehicle in Tennessee for failing to meet the requirements of § 55-4-110(b) requires objectively reasonable suspicion. As noted above, "the proper question is not whether [Defendant] was, in fact, violating § 55-4-110(b)[;]" instead, the "question is whether [Clark] had an objectively reasonable suspicion that a violation of that statute was occurring." *Id.* at 542 (holding that "even if the minimal legibility of the expiration date from a few feet away were enough to pass muster with section 110, the inability of the officer to perceive the expiration date while driving at very close proximity gave him at least reasonable suspicion to believe that the

statute was being violated."). In *Simpson*, the court noted the temporary license tag violated Tennessee law because the expiration date was illegible as the tag was "faded, weathered, torn, and otherwise deteriorated." *Id*. at 544.

Defendant points to a case discussed in *Simpson*, *United States v. Wilson,* 205 F.3d 720 (4th Cir. 2000) (*en banc*), in support of his argument that the stop was improper because "[n]o crime could have been suspected because the alleged conduct of the Defendant did not violate the law." [Doc. 39 at Page ID # 197]. In *Wilson*, the United States Court of Appeals for the Fourth Circuit unanimously held that the inability of a police officer to perceive the expiration date on a temporary tag at night—where there was no other allegation of improper display—did not give rise to reasonable suspicion that the law was being violated. *Wilson*, 205 F.3d at 723-24. The officer in *Wilson* admitted that he never saw anything illegal about the tag or the operation of the car. There was no evidence the tag was improperly displayed or deteriorated. The Fourth Circuit held suppression was required because the officer's inability to see the written-in expiration date on the tag was a function of the darkness and the small space provided for writing in the date. *Id*. As noted in *Simpson*, the Fourth Circuit held that in the absence of "any evidence that the tag 'was illegible or in any way obliterated, smudged, or faded,' or otherwise violated the law," the court was "'compel[led to] conclu[de] that the officer lacked any articulable, reasonable suspicion that a violation had occurred.'" *Simpson*, 520 F.3d at 543 (quoting *Wilson,* 205 F.3d at 723-24 (alterations in original)).

The Sixth Circuit distinguished the results in *Simpson* from *Wilson*

> for at least two reasons: (1) the officer in *Wilson* stated that "he never saw anything illegal about the tag" whereas in this case, Officer Ratcliff has steadfastly maintained that the illegibility of the expiration date was a violation of Tennessee law; and (2) unlike the tag in *Wilson,* the tag in this case was faded and deteriorating, precisely the circumstances that the *Wilson* court recognized might

12

have changed the outcome in that case.

*Id.* (citation omitted).    Similar to *Simpson*, in this case Clark has steadfastly maintained he could not read the state of origin information on the tag from a safe driving distance or even when stopped at the red light.    Like in *Simpson*, the tag itself was described as faded.

Defendant argues that an officer cannot stop a vehicle merely because it has a temporary tag or because the officer cannot read or has visual problems [Doc. 39 at Page ID # 197].    Such an overbroad application of § 55-4-110(b) likely would be unconstitutional given that the *Simpson* court held, "difficulty seeing a license plate at some unspecified distance or position, even if the license plate were visible at a closer distance or different position" does not justify a traffic stop. *Id*. at 544 (quoting *State v. Hall*, No. E2006-01915-CCA-R3-CD, 2007 WL 2917728, at *4 (Tenn. Crim. App. Oct. 5, 2007) (holding that an officer's "subjective judgment that [a] license plate [that was affixed to a ladder on the back of a van] was 'hard to see' [without the use of the headlights on his patrol car] cannot be construed as a 'particularized and objective basis' for suspecting that the defendant was in violation of [§ 55-4-110(b)]," at least where the license plate was otherwise properly displayed)) (alterations in original).[7]    Moreover, *Simpson* also clearly held that "the Fourth Amendment does not allow a policeman to stop a car just because it has temporary tags." *Id.* at 543 (citation omitted) (quotation marks omitted).    However, Clark's credible testimony does not indicate he stopped the van merely because it had a temporary tag or

---

[7] The Tennessee Court of Appeals held in *Hall* that it was not a "'particularized and objective basis' for suspecting that the defendant was in violation of a traffic offense" that a tag was "hard to see" and thus the hard to see tag did not constitute sufficient grounds for reasonable suspicion. *Hall,* 2007 WL 2917728, at *4.    The *Hall* court did not reach the issue of whether attaching a license plate to a ladder on the back of a van was actually a violation of the Tennessee statute. *See generally id.*    The pertinent issue was not whether the defendant in *Hall* violated the statute; rather, the issue was whether the officer's proffered reason for the stop was sufficient reasonable suspicion under the Constitution.    *Id.*

13

he has problems reading or seeing. Clark's testimony that the tag was not readable even when completely stopped at a red light was consistent and is supported by the video evidence. This case simply does not involve a fleeting inability to read hard-to-see information on the tag that could be cured by drawing closer while still driving a safe distance from the van.

Defendant argues the "Tennessee statute that describes the design of the tag is for a permanent tag and describes the requirement that 'Tennessee' be displayed on the tag prominently. However, no such requirements are spelled out for the temporary tag much less the temporary tags of foreign states." [Doc. 39 at Page ID # 198]. Defendant argues Clark did not show where state of origin was required information on a temporary tag or why he believed he had the duty to stop a vehicle that did not display a readable state of origin [*id.*]. However, Clark said he needed the state of origin to run the tag. If Tennessee's tag display law serves any purpose, it is "presumably to provide" law enforcement a means of readily identifying vehicles when traveling behind them within a reasonable distance. *Simpson*, 520 F.3d at 536.

I **FIND** Clark credibly[8] testified that he could not read the state of origin information on the tag while driving behind the van (or even when stopped a safe driving distance directly behind the van at a stop light). Thus, I **CONCLUDE** Clark had reasonable suspicion to believe Tennessee's tag display statute, which required the tag to be "in a condition to be clearly legible," was being violated. As a result, a temporary investigative stop was reasonable under the Fourth

---

[8] A court is given wide latitude in making its credibility determinations. *United States v. Haynes*, 301 F.3d 669, 679 (6th Cir. 2002). "In assessing credibility, a court considers numerous factors, ultimately relying on the common sense tests of reason and logic." *United States v. Caldwell*, No. 1:13-CR-128, 2015 WL 179583, at *9 (E.D. Tenn. Jan. 14, 2015) (citing *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005)). Clark's appearance, demeanor, and his descriptive account of the day's events support finding that he gave credible testimony that he could not read the state of origin information on the temporary tag from a safe driving distance. *See e.g., United States v. Simmons,* 174 F. App'x 913, 917 (6th Cir. 2006) (finding officers' testimony credible because it was substantively consistent).

14

Amendment.

To the extent Defendant implies that the claimed reasonable suspicion of a tag display violation is mere "pretext," whatever other subjective reason Clark had for making the stop is legally irrelevant and the constitutional reasonableness of the traffic stop does not depend on Clark's actual motivations. *See, e.g., Whren v. United States*, 517 U.S. 806, 813 (1996) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978) (internal quotation marks omitted) ("Subjective intent alone … does not make otherwise lawful conduct illegal or unconstitutional."); *United States v. Canipe*, 569 F.3d 597, 601 (6th Cir. 2009) (holding that because the officer "possessed probable cause to believe that a traffic violation occurred when he observed [the defendant] not wearing a seatbelt, [the officer's] motivation for making the stop (suspicion of unlawful possession of a firearm) did not undermine [the constitutionality of the stop]."); *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999) (citing *Whren*, 517 U.S. at 812-13) ("[A]n officer may stop a vehicle for a traffic violation when his true motivation is to search for contraband, as long as the officer had probable cause to initially stop the vehicle."); *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (citing *United States v. Trigg*, 925 F.2d 1064, 1065 (7th Cir. 1991) (holding that "so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful"). It is equally well established that "police officers may stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop." *Blair*, 524 F.3d at 748 (citation omitted).

That Clark indisputably *could* see the state of origin information on the tag once he stopped the van in the church parking lot before he made contact with the driver, does not change the

conclusion that the stop itself was constitutionally permissible. Accordingly, I **FIND** the government has met its burden to establish reasonable suspicion for the stop.

### C. Scope and Duration

Finding the initial seizure was justified does not end the inquiry as the Court must address whether subsequent police conduct "was reasonably related in scope to the circumstances that justified" the initial interference. *Terry*, 392 U.S. at 20. Although not entirely clear, Defendant seems to argue both that the stop was completed and uncompleted but unlawfully extended in violation of the reasoning of *Ohio v. Robinette*, 519 U.S. 33 (1996) and *United States v. Everett*, 601 F.3d 484 (6th Cir. 2010). The government appears to argue the not-yet-completed stop was not extended because that the same reasonable suspicion that justified the stop provided Clark with grounds to contact Defendant, observe the passengers, and eventually learn from Defendant that his passengers were not legally in the United States.

The pertinent issues appear to be (1) whether the purpose of the traffic stop was completed once the reasonable suspicion of a tag display violation dissipated and, if not, (2) was the yet-to-be-completed traffic stop unreasonably and measurably extended beyond the time necessary to conclude the stop prior to Defendant's admission that his passengers were "illegals." While stated separately, these are intertwined issues and will be addressed together.

As held by the Supreme Court:

> A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave. An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.

16

*Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (citations omitted).    As often reiterated by the Sixth

Circuit:

> A valid *Terry* stop must be "limited in scope and duration."
> *Florida v. Royer*, 460 U.S. 491, 500 (1983); *see also United States
> v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010).   To be limited in
> scope, "the investigative methods employed should be the least
> intrusive means reasonably available to verify or dispel the officer's
> suspicion in a short period of time."    *Royer*, 460 U.S. at 500.    To
> be limited in duration, "an investigative detention must be
> temporary and last no longer than is necessary to effectuate the
> purpose of the stop."    *Id*.

*E.g., United States v. Cochrane*, 702 F.3d 334, 340 (6th Cir. 2012).

No doubt, law enforcement officers may not unreasonably prolong an otherwise lawful

stop without running afoul of the Fourth Amendment.   *See, e.g., United States v. Stepp*, 680 F.3d

651, 661-62 (6th Cir. 2012) (citing *Everett*, 601 F.3d at 492 n.9) (holding that, to curb potential

abuse because "a crafty officer . . . may simply delay writing a ticket for the initial traffic violation

until after she has satisfied herself that all of her hunches were unfounded, [courts] also treat the

unreasonable extension of a not-yet-completed traffic stop as a seizure.").    "[T]he proper inquiry

is whether the 'totality of the circumstances surrounding the stop' indicates that the duration of *the

stop as a whole*–including any prolongation due to suspicionless unrelated questioning–was

reasonable."    *Everett*, 601 F.3d at 494 (emphasis in original) (internal citations omitted).   "An

officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert

the encounter into something other than a lawful seizure, so long as those inquiries do not

measurably extend the duration of the stop."    *Id.* at 490 (quoting *Johnson*, 555 U.S. at 333).

The overarching inquiry is one of reasonableness.    *Id.* at 493-94.    To evaluate the

reasonableness of a stop, a court considers the diligence of the officer.    *Id.* at 494.    A court "must

conduct a fact-bound, context-dependent inquiry in each case" to determine whether the "'totality

of the circumstances surrounding the stop' indicates that the duration of the stop as a whole. . . including any prolongation due to suspicionless unrelated questioning—was reasonable." *Id.* (citations omitted). An officer's "subjective intent or hope to uncover unrelated criminal conduct," however, "is irrelevant." *Id.* at 495 n. 12 (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)). The key inquiry is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *Id.* at 494 (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

I **FIND** Clark's reasonable suspicion for the stop—a tag display violation—was satisfied once Clark could see the state of origin properly displayed on the tag, which he saw at the latest as he initially approached the van in the church parking lot before he made contact with Defendant. While the word "faded" was used by Clark, the government did not take or present a photograph of the tag to demonstrate the tag's condition or have Clark explain the extent of the fading given that Clark could read the temporary tag numbers at the stop light. That the tag was covered in clear plastic does not appear to be, and has not been argued to be, a violation of the tag display law. Indeed, the government's argument seems to acknowledge that all contact between Clark and Defendant was after Clark determined the "temporary tag was legal." [*E.g.*, Doc. 40 at Page ID # 207 (arguing Clark was justified in "continuing his investigation after he had concluded that the temporary tag was legal." (citing Doc. 33 at Page ID # 176) (citing *United States v. Clayborn*, 339 F.3d 700 (8th Cir. 2003) and *United States v. Dumas*, 94 F.3d 286, 291 (7th Cir. 1996))].

In this case, the proof indicates the reasonable suspicion for the stop—the possible violation of Tennessee's tag display law—was dispelled before Clark made contact with the driver of the van. However, the Sixth Circuit indicated in *Simpson* that it is "surely permissible" for the officer, after executing the stop, and even after concluding that there was no violation of the law,

18

to inform the driver why the stop was initiated.   *Simpson*, 520 F.3d at 543; *see also United States v. Edgerton*, 438 F.3d 1043, 1051 (10th Cir. 2006) (holding that once the trooper was able to read the temporary tag, the trooper "as a matter of courtesy, should have explained to [the] Defendant the reason for the initial stop and then allowed her to continue on her way without requiring her to produce her license and registration.").   Accordingly, I further **FIND** it was reasonable for Clark to approach the van even after his initial reasonable suspicion of a tag display violation dissipated so that he could explain the basis for the stop under the reasoning of *Simmons*.   Accordingly, I **CONCLUDE** that even though Clark saw the state of origin information once the vehicles were in the church parking lot, he could approach the van to explain the basis for the stop.   A remaining question is whether the stop lasted longer than necessary to address the traffic violation that warranted the stop.

In a case not addressed by the parties, the Supreme Court resolved a division among lower courts regarding whether police routinely may extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff.   *Rodriguez v. United States*, 575 U.S. __, 135 S. Ct. 1609, 1614 (2015).   The Court held "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns."   *Id.*, 135 S.Ct. at 1614 (internal citation omitted).   Therefore, a traffic stop may not ordinarily last any longer than necessary to address the traffic infraction.   "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."   *Id.*   Tasks considered within the realm of an ordinary traffic stop include determining whether to issue a traffic ticket, checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.   *Id.* at 1615.   "An officer, in other words, may

conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.*

While the *Rodriguez* Court held "ordinary inquiries" related in scope to the purpose of a traffic stop are allowed, it also held such inquiries must be executed within the time it should have reasonably taken to complete them. *Id.* at 1609 ("A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation.'" *Id.* at 1612 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (alterations in original))). The Supreme Court endorsed precluding even a *de minimus* extension of a concluded stop, holding: "[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation." *Id.* at 1612 (alterations in original) (internal quotation marks omitted).

The holding of *Rodriguez*—that a traffic stop may last no longer than necessary to achieve its purpose—is not a new proposition in the Sixth Circuit. *See, e.g., United States v. Urrieta*, 520 F.3d 569, 574 (6th Cir. 2008) (holding that "[t]o detain a motorist any longer than is reasonably necessary to issue a traffic citation, an officer must have a reasonable suspicion that the individual has engaged in more extensive criminal conduct." (citation omitted)); *United States v. Townsend,* 305 F.3d 537, 541 (6th Cir. 2002). In *Everett*, the Sixth Circuit established a reasonable diligence standard to determine whether an officer has violated the Fourth Amendment by extending the duration of a traffic stop to ask questions, explaining:

Because the reasonable diligence standard does not "require [an officer] to move at top speed," . . . here, too, some amount of questioning is permissible—so long as the officer's overall course of action during a traffic stop, viewed objectively and in its totality, is reasonably directed toward the proper ends of the stop. By contrast, if the totality of the circumstances, viewed objectively, establishes that the officer, without reasonable suspicion, definitively abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation, this would surely bespeak a lack of diligence. So, too, if the circumstances establish that, over the course of the entire stop, "questions unrelated to the traffic violation constituted the bulk of the interaction between the trooper and the [motorist]."

*Everett*, 601 F.3d at 495.

Even prior to *Rodriguez*, the Sixth Circuit had already "adopted a bright-line rule that any subsequent prolonging, even *de minimis,* is an unreasonable extension of an otherwise lawful stop." *Stepp,* 680 F.3d at 661-62 (citing *Everett*, 601 F.3d at 492 n. 9) (citing *Urrieta*, 520 F.3d at 578-79)). The Sixth Circuit has long held that "[o]nce the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot." *Hill,* 195 F.3d at 264.

As neither party cited to *Rodriguez,* their thoughts on its application remain unidentified. However, among other arguments made in response to the motion and in its post-hearing brief, the government contended that Clark's request that Defendant exit the van was proper under the reasoning of *United States v. Street*, 614 F.3d 228, 232 (6th Cir. 2010), and that the continuation of the investigatory stop after Clark concluded that the temporary tag contained the state of origin information was appropriate under the reasoning of *United States v. Clayborn*, 339 F.3d 700 (8th Cir. 2003) and *United States v. Dumas*, 94 F.3d 286, 291 (7th Cir. 1996). Even if Clark could properly request that Defendant exit the van for officer safety reasons to explain why he initially

stopped the van,[9] the out-of-circuit, pre-*Rodriguez* cases, *Clayborn* and *Dumas*, are easily distinguished.

In *Clayborn*, a detective stopped a defendant for driving without license plates. 339 F.3d at 701. The detective did not see the temporary tag on the vehicle as he approached, but the defendant immediately told the officer that the tag was displayed on the rear window. *Id*. After being told of the tag, the officer requested the defendant's registration papers, insurance card, and driver's license. *Id*. The defendant could not produce a driver's license, and during this conversation the officer detected the odor of marijuana coming from the car. After conducting a computer check and discovering that the defendant was driving with a suspended driver's license, the detective arrested him. *Id*. The subsequent search of the car found marijuana, ammunition, and a gun. *Id*. The defendant moved to suppress, arguing that the detective should never have asked for his license because the traffic stop ended when the detective knew that he had a temporary tag. *I*d. The Eight Circuit disagreed, holding the detective's request for registration papers and identification "was reasonably related to confirming the vehicle's registration status and explaining the lack of plates." *Id*. at 702.

In contrast, Clark could see the tag and read all pertinent information except the state of origin at the stop light. Clark offered no testimony indicating that he reasonably suspected the tag might violate the law once he saw the state of origin information. By the government's own admission, once Clark stopped the van he could see the state of origin and concluded the tag did

---

[9] Under *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977), an officer may ask a driver to step out of the vehicle during a traffic stop because "[e]stablishing a face-to-face confrontation diminishes the possibility, otherwise substantial, that the driver can make unobserved movements" that could threaten the officer's safety. *See also Rodriguez*, 135 S. Ct. at 1616 ("[T]he government's officer safety interest stems from the mission of the stop itself.").

22

not violate the tag display law.   In short, Clark's initial suspicion of a tag *display* violation was dispelled upon seeing the state of origin information displayed on the tag.   If Clark had immediately developed reasonable suspicion of another crime when telling the driver why he was stopped—for example by smelling marijuana emanating from the van—he would have had a reasonable and articulable suspicion that criminal activity was afoot even though the tag display violation had dissipated.   Here, however, Clark steadfastly maintained that his immediate contact indicated only a very loaded van—and it was not until Defendant responded to his questions, in particular when Defendant indicated he worked in construction—that Clark became suspicious the van occupants were illegally in the country.   Moreover, the government did not establish that Clark made any effort to run the tag to see if it was properly registered at any time prior to Defendant's admission he knew the occupants were "illegals."

In *Dumas*, an officer conducted a *Terry* stop of a car that did not have a plainly visible temporary license plate.   94 F.3d at 290-91.   The officer conducted a criminal history check after closer inspection revealed only that a piece of cardboard that may have been a temporary plate was obscured by the car's tinted rear window and was unreadable.   *Id*.   The Seventh Circuit held the officer in *Dumas* was justified in checking the license, registration and criminal history of the driver and of the passenger because he did so as part of a further investigation that was necessary to ascertain the validity of the plate and had remaining reasonable suspicion of a violation to do so.   *Id*.

In the instant case, and as previously noted, sometime after Defendant was detained in the patrol car, Clark ran the tag and driver's license and determined the temporary tag was lawful and properly registered and that Defendant had a valid driver's license and insurance paperwork.   No evidence was submitted to suggest that Clark attempted to run the tag upon being able to see the

state of origin. While Clark may have wanted to "run" the tag and check Defendant's driver's license, he gave no testimony to indicate that he had any remaining suspicion of a tag display violation. Although Clark had a computer in his patrol car that allows him to run some tag information (and additional resources such as his THP dispatcher), no evidence was submitted to suggest that he took any steps to ascertain the validity of the tag in a diligent manner.

Although again not cited by the parties, the Sixth Circuit considered the validity of an extension of a completed traffic stop in an unpublished case, *United States v. Jones*, 479 F. App'x 705 (6th Cir. 2012). In *Jones*, the Sixth Circuit held that a police officer exceeded the scope of a traffic stop for failure to display proper license tags under Ohio law when the officer detained the driver after the officer observed a lawful temporary tag in plain view as he approached the vehicle. *Id.* at 712. The court in *Jones*, which also predates *Rodriguez*, did not directly address what inquiries could be made, if any, at that point and, unlike here, there was an Ohio law prohibiting the officer from requesting a license and registration once the tag was seen. However, the reasoning of *Jones* suggests it is appropriate to consider the stop completed once Clark determined the state of origin information was displayed on the temporary tag under the circumstances at hand. *Jones*, 479 F. App'x at 713 n.6. *Simpson's* reference to the permissibility of the officer informing the driver of why he was stopped after concluding that there was no violation of the tag display law also seems to indicate the purposes of the stop are completed upon concluding the tag display law is not violated. *Simpson*, 520 F.3d at 543.

Certainly, a traffic stop may be extended for investigatory purposes if an officer develops a reasonable suspicion of criminal activity when so informing the driver. Such reasonable suspicion, however, must be "supported by articulable facts that criminal activity may be afoot"—not a mere hunch. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989). I **CONCLUDE** Clark

violated the Fourth Amendment when he extended the stop without articulable reasonable suspicion. This extension, while brief, was not in furtherance of the traffic stop or the accompanying officer safety concerns. *See Rodriguez*, 135 S. Ct. at 1616. By Clark's own testimony, he did not think the van occupants might be in the country illegally until he learned from Defendant during questioning that Defendant worked in construction.[10]

Accordingly, I **FIND** a violation of the Fourth Amendment because either the purpose of the traffic stop was completed prior to the development of reasonable suspicion that criminal activity was afoot; or, if uncompleted since the tag and license had not been verified, that the totality of the circumstances, viewed objectively, establish that Clark, without reasonable suspicion, "definitively abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation, which bespeaks a lack of diligence." *See Everett*, 601 F.3d at 495.

### D. Good Faith Exception

Having found Clark violated Defendant's Fourth Amendment rights, the Court must next determine whether suppressing the evidence seized as a result is the appropriate remedy. The government argues that the evidence should not be excluded pursuant to the good faith exception outlined by the Supreme Court in *United States v. Herring*, 555 U.S. 135, 143 (2009). The government's very brief good-faith argument is mostly a recitation of the law, not application of the law to the pertinent facts. The argument appears to be more directed to the initial stop, but also states the exception applies due to the development of suspicion because "the trooper observed multiple aliens in the defendant's van," and the questions posed by Clark were for the purpose of

---

[10] For example, Clark found the number of people in the van suspicious—not because they were "Hispanic looking"—but because they did not look like construction workers as some were young and they did not wear safety vests or have hardhats.

"dispel[ing] his suspicion while also diligently pursuing the basis for the traffic stop." [Doc. 33 at Page ID # 185].

During the hearing, however, Clark did not agree that he thought the occupants looked like "aliens." Clark mainly indicated his suspicions about the occupants being illegally in the country arose *only* when Defendant responded that they worked in construction. Clark steadfastly testified he became suspicious because the multiple occupants of the van were not dressed as construction workers and a few were young. Consistent with this explanation, the video demonstrates Clark first asked Defendant if the occupants were "legal" immediately after Defendant said he worked in construction. Defendant, on the other hand, completely failed to address the good faith argument. Perhaps as a result, the government did not further address the argument in its post-hearing submission.

The exclusionary rule is a "judicial innovation," *United States v. Clariot*, 655 F.3d 550, 553 (6th Cir. 2011), the sole purpose of which is to deter police misconduct and future Fourth Amendment violations. *Davis v. United States*, 564 U.S. 229, 236 ("The rule's sole purpose . . . is to deter future Fourth Amendment violations.") (collecting cases). In *Herring*, the Court held that before applying the exclusionary rule, the trial court must weigh the benefits of deterrence to law enforcement with the societal costs of exclusion:

> We have never suggested that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence. To the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighted against its substantial social costs. The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free—something that offends basic concepts of the criminal justice system.

555 U.S. at 142 (internal quotation marks omitted) (citations omitted). For that reason, the *Herring* Court explained: "As laid out in our cases, the exclusionary rule serves to deter deliberate,

26

reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Id.* at 144.

No evidence was submitted by either party to indicate whether the conduct at issue is recurring. Examining Clark's conduct during the stop, it is clear he acted in a "deliberate" manner. I **FIND** Clark's deliberate actions in this case—although certainly not nefarious—warrant the suppression of evidence so as to prevent the same type of behavior from reoccurring. I further **FIND** that suppressing the challenged evidence will serve the exclusionary rule's deterrent purpose, because it will have the effect of discouraging officers from extending a traffic stop to fish for evidence of criminal activity based on a hunch or a broadly generalized profile. *See Brown v. Illinois*, 422 U.S. 590, 605 (1975) (excluding evidence where detectives' actions were purposefully calculated to procure evidence). Exclusion in a case such as this will give officers an incentive to err on the side of constitutional behavior and such deterrent value outweighs the social costs of suppression in this case.

In sum, I **FIND** the government has failed to establish Clark's conduct comes within the protections of a good faith exception on the current record.

## III.    CONCLUSION

For the reasons stated above, I **RECOMMEND**[11] that Defendant's motion to suppress
[Doc. 27] be **GRANTED** in its entirety.

s/*Susan K. Lee*
_____
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[11] Any objections to this report and recommendation must be served and filed within 14 days after
service of a copy of this recommended disposition on the objecting party.   Such objections must
conform to the requirements of Rule 59(b) of the Federal Rules of Criminal Procedure.   Failure
to file objections within the time specified waives the right to appeal the district court's order.
*Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985).   The district court need not provide *de novo* review
where objections to this report and recommendation are frivolous, conclusive, or general.   *Mira
v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).   Only specific objections are reserved for appellate
review.   *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).