UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at WINCHESTER

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| | ) | Case No. 4:17-cr-37 |
| v. | ) | |
| | ) | Judge Mattice |
| | ) | Magistrate Judge Lee |
| JESUS ANDRES LUJAN, JR. | ) | |

# ORDER

Defendant Jesus Andres Lujan, Jr. filed a Motion to Suppress on April 8, 2018. [Doc. 27]. The Court referred the matter to United States Magistrate Judge Susan K. Lee on April 9, 2018. [Doc. 28]. Magistrate Judge Lee held an evidentiary hearing regarding the motion on May 1, 2018. [Doc. 36]. On June 15, 2018, Magistrate Judge Lee filed her Report and Recommendation, [Doc. 42], pursuant to 28 U.S.C. § 636(b)(1). In her Report and Recommendation (hereinafter R&R), Magistrate Judge Lee recommended that Defendant's Motion to Suppress, [Doc. 27], be granted. [Doc. 42 at 28]. The Government filed a timely objection to the R&R. [Doc. 43]. The Defendant responded in turn. [Doc. 44].

The Court has now reviewed the entire record relevant to the instant objections, and for the reasons stated herein, the Court will **ACCEPT and ADOPT** Magistrate Judge Lee's R&R and will **GRANT** Defendant's Motion to Suppress.

## I.     BACKGROUND

The Parties do not object to the Magistrate Judge's factual determinations, and the Court concludes that they are accurate. The Magistrate Judge's factual findings, as summarized by her, are as follows:

During the evidentiary hearing, the government presented the testimony of the sole witness, Tennessee Highway Patrol ("THP") State Trooper Donnie Clark ("Clark"). Clark has 24 years of law enforcement experience with THP. Much of the encounter between Defendant and Clark was recorded by Clark's patrol car video equipment and the recording was made Exhibit 1 to the hearing.

On October 25, 2017, Clark was in the left lane traveling eastbound on Interstate 24 near Exit 111 in Winchester, Tennessee when he noticed a van in the right lane with a paper temporary license tag affixed to the rear of the large passenger van. As he traveled in the same direction passing the van in the next lane, Clark made eye contact with the driver of the van. Upon making eye contact, the driver of the van—later identified as Defendant—first slowed down and then abruptly took Exit 111-A. The eye contact and driving maneuver drew Clark's attention because the exit appeared to be unplanned and "kicked up" gravel from the shoulder of the road. Clark immediately took Exit 111-B (the second ramp of the exit) so he could follow the van on Highway 55.

As he entered Highway 55, Clark manually turned on his recording equipment and narrated why he was following the van. Clark's narration focused on the temporary license tag, which Clark concluded was not "very visible." Clark was looking for the state of origin and the temporary tag number so he could "run" the tag to get the vehicle information. As Clark followed the van, it stopped at a red light and Clark stopped directly behind the van about a car length to a car length and a half behind the van. Clark could still not read the state of origin, but he could read the main tag number. Clark had already decided to stop the van for two reasons: (1) the van made a "somewhat" suspicious and reckless exit that appeared unexpected, and (2) he could not "make out" the tag. However, Clark decided to wait until he was at a safer place to initiate the stop, so he did not activate his blue lights at the red light.

The vehicles traveled a short distance from the red light and Clark activated his blue lights and siren. The van promptly turned into a church parking lot. Clark exited his patrol car, which was behind the van preventing it from leaving, and Clark walked to the van.

On cross-examination, Clark testified the tag was not clearly legible because it was faded and covered in plastic that looked like a Ziploc-type of bag. The plastic and fading made the tag difficult to read. Clark never wavered from his testimony that he could not read the state of origin information on the tag even when stopped at the red light. Clark's testimony was not clear as to whether he could read the tag and identify the state of origin/issuance from his patrol car behind the van in the church parking lot or only once he was on foot approaching the van. What was clear is that Clark could read the temporary tag and he determined it had the required information on it prior to speaking with the driver.

Clark said once he determined the physical condition of the tag was in compliance in the church parking lot, he still had reason to continue the traffic stop because he wanted to check to see if the tag went with the van and wanted to check the driver's license. It is not clear when those checks were eventually made, but Clark did not check the registration and driver's license information until after Defendant was detained in the back of the patrol car. Clark did not know if there was a Tennessee law that applied to the display of a temporary tag, but he was aware of Tennessee's tag display statute, Tenn. Code Ann. § 55-4-110(b). Clark agreed the tag was properly fastened to the van in a place and spot clearly visible, but indicated he thought the plastic was a foreign material.[1] On cross-examination, Clark agreed that he eventually determined the tag was legal under § 55-4-110(b), regardless of any faded condition or plastic covering.

Clark proceeded to the driver's door of the van, which had darkly tinted windows. Defendant was on his cell phone when Clark approached. Clark asked for Defendant's driver's license after greeting him and asked Defendant to exit the van. When Defendant did so, Clark peeked inside the van and, for the first time, Clark saw "multiple" people in the van. Clark asked how many people were in the van and Defendant said, "fifteen or sixteen."

Clark then had Defendant move to the back of the van and explained to Defendant that he could not read the state of origin as he drove down the interstate. Clark then asked Defendant a series of questions over a couple of minutes. He asked where Defendant was headed and Defendant replied he was traveling to Atlanta. Clark asked where Defendant was coming from and he responded he was coming from Houston. Clark asked for Defendant's identification. Clark asked why Defendant took the exit (Exit 111) if he was headed to Atlanta, and Defendant responded, "Just nervous." Clark asked why he was nervous, and Defendant said, "Just going to work." In his testimony, Clark asked Defendant where they (the occupants) worked and Defendant said they were construction workers. On the video, Clark asked Defendant where he worked and Defendant said he was a construction worker. Clark then asked if the people in the van were legal and Defendant said, "Yes." Clark asked the same question again, and Defendant again said, "Yes." Clark said, "Why are you nervous, then?" Defendant then admitted he knew the occupants were "illegal."

Clark testified that when he initially peered into the van as Defendant exited it, he found the number of van occupants unusual. On cross-examination, Clark agreed that the mere presence of multiple van occupants does not violate the law. During lengthy questioning at the hearing as to whether Clark suspected the occupants of the van were illegally in the country due to their "Hispanic appearance," Clark

---

[1] Magistrate Judge Lee's FN2: The government did not argue the plastic covering itself was a "foreign material" constituting a violation of § 55-4-110(b).

repeatedly stated the occupants' physical appearances (described in questioning as small stature and dark hair/skin) was not suspicious. Clark repeatedly said he became suspicious once Defendant indicated they worked in construction because a few of the van occupants appeared to be young and the occupants were not dressed in construction gear/attire.

The pertinent interaction between Clark and Defendant is recorded. The parties agree that the relevant timeframe for consideration of the issues presented in the motion to suppress is on the recording of the stop at the time stamp from 14:02 to 14:08.3 The patrol car lights were activated at 14:05:00 and Defendant was locked in the patrol car back seat by 14:08:40. When Clark first had Defendant come to the back of the van, Clark stated, "[I] couldn't read the, uh, tag properly there. Uh, the uh, drivin' down the interstate, I couldn't tell that was from Texas." [Exhibit 1 at 14:06:13-21]. About twenty seconds later, at 14:06:42, Clark and Defendant discussed the passengers approximately as follows:

> Clark: Okay. Why are you nervous?
>
> Defendant: Just going to work.
>
> Clark: Where you—where you work at?
>
> Defendant: Carpenter. Clark: Huh?
>
> Defendant: Carpenter. Apartments, building apartments, framing.
>
> Clark: Okay. These people in here, are they legal?
>
> Defendant: Yes, sir.
>
> Clark: You sure?
>
> Defendant: Yes, sir.
>
> Clark: Why are you nervous, then?
>
> Defendant: 'Cause I know they're illegal.

[Id. at 14:06:42-14:07:03].

Eventually, sometime after Defendant was detained in the patrol car, Clark ran the tag and driver's license and determined the temporary tag was lawful and properly registered and that Defendant had a valid driver's license and insurance paperwork. Clark has a computer in his patrol car that allows him to run some information, he can also ask dispatch to run information and, if necessary, dispatch can contact authorities in other states to run information.

[Doc. 42 at 1–5]

## II.   ANALYSIS

The Court's review has a narrow focus. The core issue is whether Trooper Clark unconstitutionally extended the scope and duration of his stop of Defendant's van. Upon

review, the Court agrees with the Magistrate Judge and concludes Trooper Clark did unreasonably extend Defendant's stop in violation of the Fourth Amendment. Neither Party challenges the Magistrate Judge's conclusions regarding whether Trooper Clark's stop was lawful at its inception. As a result, that issue will not be reached.

The Fourth Amendment guarantees "the people['s]" right to be free from "unreasonable ... seizures." U.S. Const. amend. IV. Traffic stops conducted by law enforcement officers are "seizures" of one's "person" within the meaning of the Fourth Amendment. *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008). The Constitution tolerates those intrusions, but *only* when they are done in a manner that is "reasonable." It has long been established that such stops cannot be baseless, simply routine, or indefinite. Instead, a reasonable police traffic stop is one that is supported by reasonable suspicion[2] and limited in scope and duration. *United States v. Everett*, 601 F.3d 484, 488–89 (6th Cir. 2010). The existence and importance of these principles are well-settled. What is in contention in this case, rather, is what it means for a stop to be reasonably limited in scope and duration.

### A. Scope and Duration of Stop

The determinative case here is *Rodriguez v. United States*, 135 S. Ct. 1609 (2015). In *Rodriguez* the Supreme Court held "that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Id.* at 1613. Although seemingly straightforward, "the *Rodriguez* rule is far easier to articulate than to apply." *United States v. Green*, No. 17-1576, ——F.3d ——, 2018 WL 3559216, at *4 (3d Cir. July 25, 2018). For instance,

---

[2] Under Sixth Circuit precedent, almost every traffic stop requires the support of reasonable suspicion, but current circuit precedent requires traffic stops based on a completed misdemeanor to be supported by probable cause. *United States v. Simpson*, 520 F.3d 531, 540 (6th Cir. 2008).

how can a court determine whether an officer has "exceed[ed] the time needed to handle" the purpose for a traffic stop? In *Rodriguez*, the answer seemed obvious. During the stop at issue in that case, the officer handed the defendant a completed traffic citation, but instead of telling the defendant he was free to leave, he made him wait over eight minutes for backup to arrive. *Rodriguez*, 135 S. Ct. at 1613. Once they did, the stopping officer used his K9 to conduct a "dog sniff" of the defendant's car. *Id.* Now, when an officer hands a stopped driver a completed traffic citation for the conduct supporting the stop, all that is left to do is for the officer to tell the driver he or she is free to leave. *See Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave."). Waiting eight minutes for backup to arrive and running a dog under those circumstances necessarily extends the stop. But how important was the fact that the officer handed over the ticket? What if the officer had run the dog prior to completing the ticket? That was Justice Alito's critique in his dissent when he claimed the *Rodriguez* majority's decision found a violation occurred, "not because of the length of the stop, but simply because of the sequence in which [the officer] chose to perform his tasks." *Rodriguez*, 135 S. Ct. at 1624. Notwithstanding these critiques, *Rodriguez* does unambiguously resolve these issues.

      The rule laid down in *Rodriguez* deals with discernable police *action* that inevitably extend a stop, as opposed to the more difficult matters of police *inaction*, biding time, or other abstract timing concerns. To be sure, the latter issues can trigger constitutional violations. *See e.g. United States v. Sharpe*, 470 U.S. 675, 686 (1985) ("In assessing whether a detention is too long in duration to be justified as an investigative stop ... it [is] appropriate to examine whether the police diligently pursued a means of

investigation that was likely to confirm or dispel their suspicions quickly." (emphasis added)). But here, if Trooper Clark unlawfully extended Defendant's stop, it was not due to him simply biding time. As the Government correctly points out, the time between the Defendant's stop and his confession was "only two minutes and three seconds." [Doc. 43 at 3]. This is hardly indicative of foot dragging. However, *Rodriguez* is not focused on vaguely assessing time, measuring it against arbitrary notions of what constitutes promptness. *See Rodriguez*, 135 S. Ct. at 1616. Rather, *Rodriguez* requires that courts look at the officer's actions and determine whether he inevitably prolonged the stop beyond its original mission. *Id.* "How [else] could diligence be gauged other than by noting what the officer actually did and how he did it?" *Id.*

In *Rodriguez*, the officer handing over the completed ticket and waiting eight minutes for backup are red herrings. Instead, *Rodriguez* is about "dog sniff[s]." *Rodriguez*, 135 S. Ct. at 1616. ("The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket … but whether conducting the sniff 'prolongs'—*i.e.*, adds time to—'the stop.'"). The Court found it was the dog sniff itself that extended the stop. *Id.* By comparison, in *Illinois v. Caballes*, 543 U.S. 405, 406 (2005) the Court held running a dog during a traffic stop does not violate the Fourth Amendment if a second officer runs the dog while the stopping officer writes the citation. The calculus changes when a stopping officer detours from his traffic mission to run a dog around the stopped car. *See Rodriguez*, 135 S. Ct. at 1614. Running a dog during a routine traffic stop is an investigation "unrelated" to a routine stop based on a traffic violation. And "unrelated investigations" are fine, but they cannot "lengthen roadside detention." *Id.* The question here, then, is whether Trooper Clark conducted "unrelated investigations" that necessarily extended Defendant's stop.

Investigative questioning unrelated to the stop's purpose can, in some circumstances, impermissibly lengthen the stop beyond its original mission. The *Rodriguez* court held out only two examples of "unrelated investigations" that could improperly extend a stop: dog sniffs (as expected) and "questioning." *Id.* Of course, it goes without saying that an officer uttering the common and cordial "how are you doing?" does not impermissibly extend a lawful stop. There is no "categorical ban on suspicionless unrelated questioning." *Everett*, 601 F.3d at 493. Like all unrelated investigations, extraneous questioning is permissible so long as it does not "*measurably extend*" a detention. *Id.* at 490 (emphasis added) (quoting *Johnson*, 555 U.S. at 333). But when does unrelated questioning "measurably extend" a stop? *Id.*

When determining whether unrelated questioning measurably extends a stop, it is important to take into account the totality of the circumstances. *Id.* at 494. It is "inappropriate" to do as the Government asks and look at the "*interval of prolongation* in isolation." *Id.* (emphasis in original). Instead, it is "important[]" to look at extraneous questioning that occurred and consider the "*subject*" of the questions and their "quantity." *Id.* (emphasis in original). Some types of questions are acceptable in and of themselves. For example, "locomotion-related inquiries"—including questions about: travel plans and history, "the driver's authority to operate the vehicle," etc.—are generally acceptable. *Id.* Further, any questions reasonably related to the officer's safety are unquestionably permitted (*e.g.* inquiries about whether the vehicle's occupants have dangerous weapons). *Id.* Lines of inquiry that can be a sign that an officer is impermissibly extending a stop, however, are those questions that are "*relevant only* to ferreting out unrelated criminal conduct.*" *Id.* at 495 (emphasis added). To be sure, "some amount" of these sorts of interrogatory questions can be tolerated. *Id.*; *see also*

8

*Rodriguez*, 135 S. Ct. at 1624 n.2 (Alito, J., dissenting) ("[I]t remains true that police may ask questions aimed at uncovering other criminal conduct ... during a valid stop."). However, if the questions make up a "*bulk* of the interaction between the trooper and the motorist," it is evidence the officer "definitively abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation." *Everett*, 601 F.3d at 495. Doing so "would surely bespeak a lack of diligence." *Id.*

Turning to the facts at hand, Trooper Clark stopped Defendant's van because he was unable to read the vehicle's tag. At first, he believed this to be a result of the van's tag being improperly displayed or too faded. As he approached the van, he soon realized the tag was not only properly displayed but was otherwise "legal." It seems Trooper Clark's initial inability to read the tag's state while traveling behind the van was a result of the small typeface Texas uses on its temporary tags, rather than some failing on Defendant's part. Trooper Clark's realization is important; it colors the rest of the stop. The reasonable suspicion supporting the stop had been satisfied. The Trooper's time window and traffic mission, as a result, were certainly limited. *See Rodriguez*, 135 S. Ct. at 1614 ("The scope of the detention must be carefully tailored to its underlying justification." (parenthetically quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

Upon reaching Defendant, Trooper Clark asked him to step out of the driver's seat and move to the back of the van. Under Tenth Circuit precedent, Trooper Clark would have been permitted to merely explain the reason for the stop but then let Defendant "continue on [his] way without requiring [him] to produce [his] license and registration." *United States v. Edgerton*, 438 F.3d 1043, 1051 (10th Cir. 2006). Here, Trooper Clark explained the reason for his stop but soon went into a line of typical "locomotion-related inquiries," such as where Defendant was going, where he was

coming from, why he exited the interstate. He also asked for Defendant's identification. There could be a reasonable debate regarding whether these initial questions "measurably extend[ed]" the stop. *See Everett*, 601 F.3d at 491. However, the Court does not have to resolve that issue one way or the other. The questions did not stop there; they continued, venturing into subjects "relevant only to ferreting out unrelated criminal conduct." *Id.* at 495.

The traffic stop soon turned into what can be fairly characterized as a roadside interrogation. Starting with Trooper Clark asking Defendant "why are you nervous?," it included inquiring into where Defendant worked, whether the van's passengers were "legal," which was emphasized with "are you sure?", and the inquiry ended with Trooper Clark asking again, "why are you nervous, then?" before Defendant broke and confessed.

The Court recognizes this line questioning was brief, lasting twenty seconds at most, but the brevity was not due to any restraint on Trooper Clark's part. Rather, it was a result of Defendant's swift capitulation to Trooper Clark's incessant questioning. And although the interrogation unfolded quickly, it "measurably extend[ed]" Defendant's stop. *Id.* at 491. In engaging in this line of inquiry, Trooper Clark detoured from his traffic mission and "embarked on another sustained course of investigation." *Id.* at 495. The unrelated questioning made up the "bulk" of what should have otherwise been only a brief detention. *Id.* at 495. The Government argues "to the extent that the traffic stop was prolonged at all ... it was not unduly or unreasonably prolonged." [Doc. 43 at 9]. Nevertheless, the Supreme Court has rejected even a *de minimis* exception for stop extensions. *See Rodriguez*, 135 S. Ct. at 1614 ("Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.'" (quoting *Royer*, 460 U.S. at 500)).

During routine traffic stops, police are permitted to conduct "ordinary inquiries incident to [the traffic stop]." *Rodriguez*, 135 S. Ct. at 1615. This includes "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* Of course, these incidental checks add time to a stop, but they are otherwise permitted as being reasonably related to a traffic stop's mission. For example, it is reasonable to check to see if a driver has warrants to determine whether the "apparent traffic violator is wanted for one or more previous traffic offenses." *Id.* (parenthetically quoting 4 W. LaFave, Search and Seizure § 9.3(c), at 516 (5th ed. 2012)). Some of these incidental inquires may not be permissible if it becomes apparent no traffic violation occurred, such as was the case here. *See e.g. id.* However, what is clear is that police are not allowed to use the time that would have been needed for incidental inquiries as "bonus time" to venture out and conduct unrelated investigations. *Id.* at 1616. As far as the Government argument that Trooper Clark was entitled to conduct unrelated inquiries during the time he would have otherwise spent doing "administrative," routine traffic procedures, [*See* Doc. 43 at 9], those arguments fail under *Rodriguez*'s clear precedent. *Id.* Accordingly, the Court finds Trooper Clark measurably extended his stop by engaging in unrelated questioning.

### B.    Other Reasonable Suspicion

Having found Trooper Clark's unrelated questioning measurably extended Defendant's dentition, it must next be determined whether the unrelated questioning was otherwise supported by articulable and reasonable suspicion. The Court finds it was not. Other than the "hard-to-read tag," the Government points to Defendant's "reckless exit" off the interstate as other grounds for reasonable suspicion supporting the stop.

[Doc. 43 at 2]. According to the Government, Defendant's "reckless exit" was "a dramatic evasive maneuver." [*Id.* at 13 n.2]. By contrast, Trooper Clark described the exit as "the vehicle ... slowed abruptly and then took the ... exit ramp," and "kicked up some gravel" in the "shoulder area" of the road. [Doc. 45 at 9–10]. Trooper Clark further explained that the exit "looked ... kind of not planned." [*Id.*]. The Government claims this exit was an "[u]nprovoked flight" that occurred upon Defendant noticing Trooper Clark's patrol car, and claims it is a "pertinent factor" to finding reasonable suspicion for the stop outside of the tag issue. [*Id.*]. It is true that "*obvious* attempts to evade officers can support a reasonable suspicion." *United States v. Smith*, 427 F. App'x 413, 419 (6th Cir. 2011) (emphasis added) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975)). For example, sudden, unprovoked flight from police in a high crime area can support a finding of reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). However, an "abrupt[]" "slow[ing]" and exit off of the interstate that "looked ... kind of not planned," is not an "obvious attempt[] to evade" the police. [*Id.*] *Id.* Drivers abruptly slow and take interstate exits countless times a day and there are an infinite number of innocent reasons for doing so. On the other hand, even conduct that can have an innocent explanation can support reasonable suspicion when it is "[t]aken together" with suspicious but otherwise innocent factors. *United States v. Arvizu*, 534 U.S. 266, 274–76 (2002). Accordingly, the Court will examine other factors to determine whether otherwise innocent conduct accumulates to the point of reasonable suspicion.

The Government does point to other facts it claims supports reasonable suspicion when considered together. First, the Government asserts that despite the van having an out-of-state tag, it did not stop at a restaurant or gas station after it exited, which "could ... indicate the exit was unplanned." [Doc. 43 at 7]. Further the Government asserts the

van itself looked suspicious because it had tinted windows. The Court finds even when these facts are considered in light of the exit that "looked ... kind of not planned," it is not sufficient to amount to reasonable suspicion.

After the stop, there was other evidence the Government claims is pertinent to finding reasonable suspicion. First is the admission by Defendant that he was nervous. Nervousness can be a factor considered in determining reasonable suspicion, but it should only be considered in "conjunction with other factors." *United States v. Winters*, 782 F.3d 289, 299 (6th Cir. 2015). Otherwise, "nervousness is an unreliable indicator." *Id.* Accordingly, Defendant's nervousness will be considered with other facts. The Government asserts Trooper Clark noticed a large number of people in the van, and that he noticed they were Hispanic. [*Id.*]. To the contrary, Trooper Clark said he could not make out the race of some of the passengers. [Doc. 45 at 56]. He admitted "*some*" of the passengers had "dark skin[] with dark hair" [*Id.* (emphasis added)]. When asked if any of the passengers were "[c]aucasian," he could not say, claiming merely "not that I saw." [*Id.*]. He did believe the passengers were illegal immigrants, but he suspected this because the van's passengers "were just packed in there as tight as they could be." [*Id.* at 54]. It does not seem that Trooper Clark suspected the number of passengers in the fifteen passenger van or their seating position to be a violation of any applicable traffic laws. [*See e.g. id.*].

Finally, the Government claims Trooper Clark formulated reasonable suspicion when Defendant said the van's passengers "were construction workers," because this seemed inconsistent with the passenger's attire and lack of equipment. [Doc. 43 at 8]. However, after reviewing Trooper Clark's dash cam video, the Court finds the Defendant never said the passengers were construction workers. Rather, Defendant claimed he was

a construction carpenter and that he was heading to work. It seems Trooper Clark found those statements implied the passengers were also construction workers. Despite the implications surrounding the statements, there are problems with considering them in the Court's analysis. The statements arose after Trooper Clark embarked on his unrelated interrogation, and those statements would not have been elicited if he had not diverted from his traffic mission. Accordingly, the Court finds Trooper Clark's unrelated interrogation was based solely on inarticulable suspicion and impermissibly extended the stop. Accordingly, Trooper Clark's actions infringed upon Defendant's Fourth Amendment right against unreasonable seizures.

### C. Good Faith Exception

Because Trooper Clark violated Defendant's Fourth Amendment rights, the evidence obtained as a result of the violation will be suppressed. The Government asserts, however, that the "good faith exception" to the exclusionary rule should step in here and otherwise permit the inclusion of evidence unlawfully obtained from Defendant's defective stop.

The good faith exception is founded in the common sense idea that a "criminal should not 'go free because the constable has blundered.'" *Herring v. United States*, 555 U.S. 135, 148 (2009) (quoting *People v. Defore*, 150 N.E. 585, 588–89 (N.Y. 1926) (Cardozo, J. writing)). Mere police negligence does not support use of the exclusionary rule. *Id.* Under those circumstances, the "marginal deterrence" imposed by the exclusionary rule does not "'pay its way'" when compared to the costs on society and the criminal justice system. *Id.*

Under these facts, the Court finds Trooper Clark was not merely negligent in his actions. Converting a routine traffic stop into an interrogation is not something that

occurs by happenstance or accident. Reasonable officers understand traffic stops are not open invitations for police to fish for any and every clue of potential crime. The Court appreciates that Trooper Clark was acting in the "competitive enterprise of ferreting out crime," and once there it is easy for one to get caught up in the pursuit and lose sight of boundaries, but here Trooper Clark's eagerness caused him to go too far. His actions infringed on constitutional boundaries, and the Court finds exclusion does not impose an unwarranted social cost. Accordingly, the Court finds the good faith exception does not apply to these facts.

### III. CONCLUSION

For the reasons stated herein:

- The Government's Objections, [Doc. 43], are hereby **OVERRULED**;

- Magistrate Judge Lee's Report and Recommendations, [Doc. 42], is hereby **ACCEPTED and ADOPTED**; and

- Defendant's Motion to Suppress, [Doc. 27], is hereby **GRANTED**.

**SO ORDERED** this 7th day of August, 2018

*/s/ Harry S. Mattice, Jr.*
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE